# EXHIBIT A

**SUMMONS - CIVIL**
JD-CV-1  Rev. 2-22
C.G.S. §§ 51-346, 51-347, 51-349, 51-350, 52-45a, 52-48, 52-259;
P.B. §§ 3-1 through 3-21, 8-1, 10-13

| For information on ADA accommodations, contact a court clerk or go to: www.jud.ct.gov/ADA. |
|---|

STATE OF CONNECTICUT
SUPERIOR COURT
*www.jud.ct.gov*



RECEIVED
APR 0 8 2024
*Secretary of the State*

**Instructions are on page 2.**

☐ Select if amount, legal interest, or property in demand, not including interest and costs, is LESS than $2,500.

☒ Select if amount, legal interest, or property in demand, not including interest and costs, is $2,500 or MORE.

☐ Select if claiming other relief in addition to, or in place of, money or damages.

**TO: Any proper officer**
By authority of the State of Connecticut, you are hereby commanded to make due and legal service of this summons and attached complaint.

| Address of court clerk *(Number, street, town and zip code)* | Telephone number of clerk | Return Date *(Must be a Tuesday)* |
|---|---|---|
| 1 Court Street, Middletown 06457 | ( 860 ) 343 – 6400 | 5/21/2024 |

| ☒ Judicial District | G.A. | At *(City/Town)* | Case type code *(See list on page 2)* | |
|---|---|---|---|---|
| ☐ Housing Session | ☐ Number: | Middlesex at Middletown | Major: **M** | Minor: **90** |

**For the plaintiff(s) enter the appearance of:**

| Name and address of attorney, law firm or plaintiff if self-represented *(Number, street, town and zip code)* | Juris number *(if attorney or law firm)* |
|---|---|
| The McMinn Employment Law Firm, LLC, 100 Lafayette Blvd, Suite 1100, Bridgeport, CT 06604 | 443244 |

| Telephone number | Signature of plaintiff *(if self-represented)* |
|---|---|
| ( 203 ) 683 – 6007 | |

| The attorney or law firm appearing for the plaintiff, or the plaintiff if self-represented, agrees to accept papers (service) electronically in this case under Section 10-13 of the Connecticut Practice Book. ☒ Yes ☐ No | E-mail address for delivery of papers under Section 10-13 of the Connecticut Practice Book *(if agreed)* michael@mcminnemploymentlaw.com |
|---|---|

| Parties | | Name *(Last, First, Middle Initial)* and address of each party *(Number; street; P.O. Box; town; state; zip; country, if not USA)* | |
|---|---|---|---|
| **First plaintiff** | Name: | Robert, Justin | P-01 |
| | Address: | 1412 Twin Circle Drive, South Windsor, CT 06074 | |
| **Additional plaintiff** | Name: | | P-02 |
| | Address: | | |
| **First defendant** | Name: | Outside the Box Education, LLC, d/b/a Cortiva Institute, 45 Shunpike Road, Suite 10, Cromwell, Connecticut 06416 | D-01 |
| | Address: | Agent: Secretary of State, 165 Capitol Ave., P.O. BOX 150470, Hartford, CT, 06115 | |
| **Additional defendant** | Name: | HICI Go, LLC, d/b/a Cortiva Institute , 2001 W. Sample Road, Suite 318, Pompano Beach, Fl 33064 | D-02 |
| | Address: | Agent: Neal R Heller, 2001 W. Sample Road, Suite 318, Pompano Beach, Fl 33064 | |
| **Additional defendant** | Name: | NT Holdings, LLC, d/b/a Cortiva Institute , 2001 W. Sample Road, Suite 318, Pompano Beach, Fl 33064 | D-03 |
| | Address: | Agent: Neal R Heller, 2001 W. Sample Road, Suite 318, Pompano Beach, Fl 33064 | |
| **Additional defendant** | Name: | | D-04 |
| | Address: | | |

| Total number of plaintiffs: 1 | Total number of defendants: 3 | ☐ Form JD-CV-2 attached for additional parties |
|---|---|---|

## Notice to each defendant

1. **You are being sued.** This is a summons in a lawsuit. The complaint attached states the claims the plaintiff is making against you.
2. To receive further notices, you or your attorney must file an *Appearance* (form JD-CL-12) with the clerk at the address above. Generally, it must be filed on or before the second day after the Return Date. The Return Date is not a hearing date. You do not have to come to court on the Return Date unless you receive a separate notice telling you to appear.
3. If you or your attorney do not file an *Appearance* on time, a default judgment may be entered against you. You can get an *Appearance* form at the court address above, or on-line at https://jud.ct.gov/webforms/.
4. If you believe that you have insurance that may cover the claim being made against you in this lawsuit, you should immediately contact your insurance representative. Other actions you may take are described in the Connecticut Practice Book, which may be found in a superior court law library or on-line at https://www.jud.ct.gov/pb.htm.
5. If you have questions about the summons and complaint, you should talk to an attorney.
   **The court staff is not allowed to give advice on legal matters.**

| Date | Signed *(Sign and select proper box)* | ☒ Commissioner of Superior Court | Name of person signing | For Court Use Only |
|---|---|---|---|---|
| 4/4/2023 | | ☐ Clerk | Michael C. McMinn | |

If this summons is signed by a Clerk:
a. The signing has been done so that the plaintiff(s) will not be denied access to the courts.
b. It is the responsibility of the plaintiff(s) to ensure that service is made in the manner provided by law.
c. The court staff is not permitted to give any legal advice in connection with any lawsuit.
d. The Clerk signing this summons at the request of the plaintiff(s) is not responsible in any way for any errors or omissions in the summons, any allegations contained in the complaint, or the service of the summons or complaint.

A TRUE AND PROPER
ATTEST
CHARLES J. LILLEY
STATE MARSHAL/INDIFFERENT PERSON

| I certify I have read and understand the above: | Signed *(Self-represented plaintiff)* | Date | Docket Number |
|---|---|---|---|

| Print Form | Page 1 of 2 | Reset Form |
|---|---|---|

## Instructions

1. *Type or print legibly. If you are a self-represented party, this summons must be signed by a clerk of the court.*
2. *If there is more than one defendant, make a copy of the summons for each additional defendant. Each defendant must receive a copy of this summons. Each copy of the summons must show who signed the summons and when it was signed. If there are more than two plaintiffs or more than four defendants, complete the Civil Summons Continuation of Parties (form JD-CV-2) and attach it to the original and all copies of the summons.*
3. *Attach the summons to the complaint, and attach a copy of the summons to each copy of the complaint. Include a copy of the Civil Summons Continuation of Parties form, if applicable.*
4. *After service has been made by a proper officer, file the original papers and the officer's return of service with the clerk of the court.*
5. *Use this summons for the case type codes shown below.*

   *Do not use this summons for the following actions:*

   (a) *Family matters (for example divorce, child support, custody, parentage, and visitation matters)*
   (b) *Any actions or proceedings in which an attachment, garnishment or replevy is sought*
   (c) *Applications for change of name*
   (d) *Probate appeals*

   (e) *Administrative appeals*
   (f) *Proceedings pertaining to arbitration*
   (g) *Summary Process (Eviction) actions*
   (h) *Entry and Detainer proceedings*
   (i) *Housing Code Enforcement actions*

## Case Type Codes

| MAJOR DESCRIPTION | CODE Major/ Minor | MINOR DESCRIPTION | MAJOR DESCRIPTION | CODE Major/ Minor | MINOR DESCRIPTION |
|---|---|---|---|---|---|
| Contracts | C 00 | Construction - All other | Property | P 00 | Foreclosure |
| | C 10 | Construction - State and Local | | P 10 | Partition |
| | C 20 | Insurance Policy | | P 20 | Quiet Title/Discharge of Mortgage or Lien |
| | C 30 | Specific Performance | | P 30 | Asset Forfeiture |
| | C 40 | Collections | | P 90 | All other |
| | C 50 | Uninsured/Underinsured Motorist Coverage | Torts (Other than Vehicular) | T 02 | Defective Premises - Private - Snow or Ice |
| | C 60 | Uniform Limited Liability Company Act – C.G.S. 34-243 | | T 03 | Defective Premises - Private - Other |
| | C 90 | All other | | T 11 | Defective Premises - Public - Snow or Ice |
| Eminent Domain | E 00 | State Highway Condemnation | | T 12 | Defective Premises - Public - Other |
| | E 10 | Redevelopment Condemnation | | T 20 | Products Liability - Other than Vehicular |
| | E 20 | Other State or Municipal Agencies | | T 28 | Malpractice - Medical |
| | E 30 | Public Utilities & Gas Transmission Companies | | T 29 | Malpractice - Legal |
| | E 90 | All other | | T 30 | Malpractice - All other |
| Housing | H 10 | Housing - Return of Security Deposit | | T 40 | Assault and Battery |
| | H 12 | Housing - Rent and/or Damages | | T 50 | Defamation |
| | H 40 | Housing - Housing - Audita Querela/Injunction | | T 61 | Animals - Dog |
| | H 50 | Housing - Administrative Appeal | | T 69 | Animals - Other |
| | H 60 | Housing - Municipal Enforcement | | T 70 | False Arrest |
| | H 90 | Housing - All Other | | T 71 | Fire Damage |
| Miscellaneous | M 00 | Injunction | | T 90 | All other |
| | M 10 | Receivership | Vehicular Torts | V 01 | Motor Vehicles* - Driver and/or Passenger(s) vs. Driver(s) |
| | M 15 | Receivership for Abandoned/Blighted Property | | V 04 | Motor Vehicles* - Pedestrian vs. Driver |
| | M 20 | Mandamus | | V 05 | Motor Vehicles* - Property Damage only |
| | M 30 | Habeas Corpus (extradition, release from Penal Institution) | | V 06 | Motor Vehicle* - Products Liability Including Warranty |
| | M 40 | Arbitration | | V 09 | Motor Vehicle* - All other |
| | M 50 | Declaratory Judgment | | V 10 | Boats |
| | M 63 | Bar Discipline | | V 20 | Airplanes |
| | M 66 | Department of Labor Unemployment Compensation Enforcement | | V 30 | Railroads |
| | M 68 | Bar Discipline - Inactive Status | | V 40 | Snowmobiles |
| | M 70 | Municipal Ordinance and Regulation Enforcement | | V 90 | All other |
| | M 80 | Foreign Civil Judgments - C.G.S. 52-604 & C.G.S. 50a-30 | | | *Motor Vehicles include cars, trucks, motorcycles, and motor scooters. |
| | M 83 | Small Claims Transfer to Regular Docket | Wills, Estates and Trusts | W 10 | Construction of Wills and Trusts |
| | M 84 | Foreign Protective Order | | W 90 | All other |
| | M 89 | CHRO Action in the Public Interest - P.A. 19-93 | | | |
| | M 90 | All other | | | |

**RETURN DATE: MAY 21, 2024**

| | | |
|---|---|---|
| JUSTIN ROBERTS, | : | SUPERIOR COURT |
| | : | |
| Plaintiff, | : | J.D. OF MIDDLESEX |
| | : | AT MIDDLETOWN |
| v. | : | |
| | : | |
| OUTSIDE THE BOX EDUCATION LLC, | : | |
| d/b/a CORTIVA INSTITUTE, | : | |
| HICI GO, LLC, d/b/a CORTIVA | : | |
| INSTITUTE, and, | : | |
| NT HOLDINGS, LLC, d/b/a | : | |
| CORTIVA INSTITUTE, | : | |
| | : | |
| Defendants. | : | APRIL 4, 2024 |

## COMPLAINT FOR DAMAGES AND REINSTATEMENT

### JURISDICTION AND VENUE

1.  This action arises under Connecticut General Statute § 31-51q, Connecticut General Statute § 31-51m, and Connecticut common law.

### PLAINTIFF

2.  The Plaintiff, Justin Roberts ("Roberts" or "Plaintiff"), is a natural person and resident of the City of South Windsor, Hartford County, State of Connecticut.

### DEFENDANTS

3.  The Defendant, Outside the Box Education, LLC, d/b/a Cortiva Institute ("Cortiva"), is incorporated in Florida, registered to do business in the State of Connecticut, and conducts substantial business in Connecticut, operating a location at 45 Shunpike Road, Suite 10, Cromwell, Connecticut 06416, where Plaintiff was employed.

-1-

4. The Defendant, HICI Go, LLC, d/b/a Cortiva Institute ("HICI"), is incorporated in Florida, registered to do business in the State of Florida, and conducts substantial business in Connecticut, operating a location at 45 Shunpike Road, Suite 10, Cromwell, Connecticut 06416, where Plaintiff was employed.

5. The Defendant, NT Holdings, LLC, d/b/a Cortiva Institute ("NT Holdings"), is incorporated in Florida, registered to do business in the State of Florida, and conducts substantial business in Connecticut, operating a location at 45 Shunpike Road, Suite 10, Cromwell, Connecticut 06416, where Plaintiff was employed.

## FACTUAL ALLEGATIONS

6. Cortiva is massage therapy and skincare school located in Cromwell, CT.

7. Neal Heller ("Heller") is the Chief Executive Officer ("CEO") and President of Cortiva.

8. Cortiva is owned by NT Holdings.

9. NT Holdings owns and operates a network of massage therapy and skincare schools collectively called Cortiva Institute.

10. Each Cortiva Institute is individually registered to do business in the state in which they are located.

11. Cortiva Institutes operates facilities in Texas, Maryland, Florida, Pennsylvania, and Connecticut.

12. Each school is branded as Cortiva Institute.

13. Heller is the CEO and President of each Cortiva Institute location.

14. NT Holdings does not disclose the individual ownership entities of each school.

15. NT Holdings does not disclose to students that each school is a separate entity.

-2-

16. NT Holdings manages Cortiva Institutes through HICI.

17. HICI conducts administrative functions for all Cortiva Institute locations.

18. HICI's work for Cortiva Institute includes conducting human resource functions, regulatory compliance, operation, marketing, finances, education, communications, admissions, and supervision.

19. HICI's work for each location is internally referred to as "Corporate."

20. NT Holdings and HICI determined the wages, benefits, and other compensation for Cortiva employees.

21. NT Holdings and HICI assigned Cortiva employees their duties to be performed.

22. NT Holdings and HICI supervised Cortiva employees.

23. NT Holdings and HICI determined the work rules and directions for the manner, means and methods of Cortiva employees performing their job duties.

24. NT Holdings and HICI determined the tenure of each Cortiva employee, including their hiring and termination.

25. NT Holdings and HICI were responsible for regulatory compliance at Cortiva.

26. Cortiva, NT Holdings, and HICI jointly employed Roberts.

27. Cortiva, NT Holdings, and HICI are hereinafter collectively referred to as Cortiva.

28. NT Holdings and HICI are hereinafter collectively referred to as "Corporate."

29. Roberts was hired and began working as a School Admissions Representative for Cortiva on July 17, 2022, at Cortiva's Cromwell location.

30. Roberts' duties included reaching out to interested potential students and enrolling them in courses at Cortiva.

-3-

31. Roberts was very successful in converting potential students to enrolled students, routinely leading in enrollment numbers, and received a raise in January 2023.

32. When students enroll at Cortiva, the students pay a fee for kit that is provided by Cortiva.

33. In January 2023, the kit fee cost was $795.

34. On January 13, 2023, Roberts and other Admissions Representatives met with the Corporate Director of Operations, Rene Lezcano ("Lezcano.")

35. The Admissions Representatives in the meeting included employees from Cortiva's Cromwell and King of Prussia, PA locations.

36. Lezcano advised Admissions Representatives that effective February 2023, Cortiva would no longer provide massage tables for massage therapy students as part of their kit.

37. Lezcano stated that the table was no longer included in the kit because the cost of the table had increased.

38. Prior to February 2023, Cortiva provided one of two massage tables to students with their kits.

39. The tables available included the Stronglite Classic Deluxe Portable Massage Table Package ("the Classic Deluxe"), which was the more expensive of the two tables.

40. The Classic Deluxe has a manufacturer's suggested retail price of $479.

41. Students who enrolled after February 1, 2023, were still charged $795 for their kits despite no longer receiving a table.

-4-

42. After Cortiva stopped providing a table, students received two massage lotions, a massage oil, a nylon holster for a bottle of lotion or oil, and any free samples Cortiva had available.

43. Roberts realized students would be upset paying a $795 kit fee for the limited materials that they received and not receiving a table.

44. Roberts asked Lezcano what he should tell students when they asked what they would receive in their kits.

45. Lezcano was unable to provide an answer and told representatives that he would look into it.

**A.    Mr. Roberts Makes A First Report of Good-Faith Concerns and Violations**

46. On January 19, 2023, Lezcano visited Cortiva's Connecticut location to talk with faculty and staff.

47. After the meeting, Roberts followed up with Lezcano, asking him in a Teams chat when a tuition and fee sheet would reflect the change of the cost of kits and reallocate it to tuition.

48. Lezcano advised Roberts that he would speak with Corporate Director of Regulatory Compliance Nicole Vitez ("Vitez"), and if he was unable to have the table portion of the kit fee reallocated to tuition, Lezcano would coach representatives on proper responses to questions.

49. On February 15, 2023, Ashley Hart ("Hart") was hired as Corporate Admissions Manager and became Roberts' direct supervisor.

-5-

50. On February 20, 2023, Roberts raised the issue of the price of the $795 student kit with Hart.

51. On February 21, 2023, King of Prussia Campus Director Nick Liberatore ("Liberatore") reached out to Roberts for advice on advising students about the kit fee.

52. Liberatore asked Roberts whether Cortiva had made any changes to the price breakdown in the enrollment agreement or other paperwork.

53. Liberatore expressed concern over the cost of the kit fee compared to what students received.

54. On April 14, 2023, Roberts again raised the lack of transparency regarding Cortiva's $795 kit fee.

55. Roberts asked his superiors at Cortiva for clear instructions when addressing students' concerns and questions about the kit fee.

56. Once again, Roberts was told Cortiva would find out and let him know how to respond to these questions.

57. After the meeting, King of Prussia Admissions Representative, Valerie Acton ("Acton"), sent Roberts a Teams message thanking him for speaking up about the tuition fee with her and acknowledging that justifying the $795 kit fee without the inclusion of a massage table was uncomfortable.

58. Acton, similar to Roberts, also believed that the new kit fee was more properly assessed as tuition.

59. Acton and Roberts anticipated that students would talk to each other about what they received as part of the kit fee and would realize that the kit received was not worth

-6-

nearly a fraction of the money spent for kit now that a massage table was not included.

60. That evening, Hart sent employees an email stating that Cortiva was there "…to help the students. We changed the kit for a reason and we as a company are not here to take advantage of our students."

61. Hart stated that Cortiva would be sending out a revised tuition and fee schedule to show that the cost of the table had been reallocated to tuition.

### B.    Mr. Roberts Makes A Second Report of Good-Faith Concerns and Violations

62. On April 17, 2023, Roberts arrived at work and had several text messages asking him who he was and how he got the recipient's phone number.

63. Roberts saw that automatic texts were sent to potential students from his phone over the weekend.

64. When a potential student submits an inquiry online through Cortiva's website, Cortiva sends an automated text response within five minutes of the inquiry.

65. Cortiva's website obtains written consent to send text messages to potential students at the time the inquiry is made.

66. An inquiring student is also assigned to an Admissions Representative, who thereafter follows up with the potential student.

67. Admissions Representatives receive emails when they are assigned a lead.

68. Unlike previous text messages, Robert's name was now included in the automated text messages and the texts were sent to inquiring students in the early morning hours.

-7-

69. Prior to April 14, 2023, individual Admissions Representatives were not identified by name in these text messages.

70. Beauty Schools Directory ("BSD") is an aggregate search engine that provides users with a list of schools in their area.

71. In order to view the list, users must submit their name, phone number, and email address to BSD.

72. When submitting their phone numbers to access search results, BSD obtains text message consent from users to receive text messages from BSD.

73. BSD then sells the user's information as a "lead" to any school that chooses to buy the lead.

74. If a user is given Cortiva as a school in their area, Cortiva automatically purchases the user's information and immediately assigns an Admissions Representative to the lead.

75. Cortiva's internal tracking software registers the lead source as BSD.

76. Admissions Representatives are then sent an email advising that a lead has been assigned to them.

77. Five minutes after the lead is purchased and assigned, Cortiva sends an automated text message to the user.

78. No separate consent is obtained from potential students to receive text messages from Cortiva regarding their BSD inquiries.

79. Under the Telephone Consumer Protection Act, non-emergency, non-medical marketing text messages may only be sent from 8:00 am through 9:00 pm local time regardless of consent.

-8-

80. BSD leads are significantly less successful than leads that come through Cortiva's website because BSD leads are not aware that any representative from Cortiva will be contacting them.

81. Contact from a BSD referral is similar to a telemarketing cold-call to a potential student.

82. Roberts was concerned that the text messages were being sent out late at night and were representing that he had personally sent them when he was obviously not at work.

83. Roberts reported his concerns to Hart and advised her that he would prefer to reach out to his leads directly.

84. Roberts noted that he considered the text messages spam and believed that they would make his purposeful outreach to a potential student more difficult.

85. Hart advised Roberts that the text messages were not spam but instead were automatic responses for potential students so that they could respond to Roberts directly about enrolling at Cortiva.

86. Hart agreed to change Roberts' last name to his last initial on the text messages.

87. Roberts told Hart that the text messages were misleading and asked that his entire name and likeness be removed from automated messages, further stating that he did not consent to Cortiva using his name or likeness in automated text messages.

88. Roberts again told Hart that the text messages were being sent in the middle of the night.

89. Hart responded by telling Roberts that she had forwarded his concern to Cortiva's President, Heller, for review.

90. Roberts felt that this was unnecessary, as he had only asked that his name be removed from automated text features, and he told Hart that he did not want his concern sent up the chain.

91. Roberts reiterated to Hart he did not want his name and/or likeness to be used without his consent as if to appear that he was initiating the text messages.

92. Hart told Roberts that he had mentioned the word "illegal" when discussing the text messages, which he did not.

93. Hart stated Cortiva wanted to make sure that they were doing what was best for the company and the representatives.

94. Hart perceived Roberts' report to allege that Cortiva's actions in sending the text messages was illegal.

95. Roberts replied, stating that he mentioned his concern to his direct supervisor, that it did not seem appropriate, and that it was a protected right in the State of Connecticut.

96. Roberts withdrew his consent in writing to having his information automatically sent to potential students via text messages.

97. On April 27, 2023, Lezcano and Roberts spoke via a Teams call.

98. Lezcano acknowledged Roberts' concern over his name being used in marketing materials, but stated Cortiva ignored the request and continued to use his name.

99. Roberts told Lezcano that Hart refused to train him on new materials, as she had trained other Admissions Representatives.

100. Hart later reached out to schedule Roberts' training for May 17, 2023.

-10-

### C. Mr. Roberts is Retaliated Against After Raising Good-Faith Concerns

101. On May 4, 2023, the Campus Director at Cortiva's Cromwell location, Sandra Cook ("Cook"), told Roberts that he would no longer be receiving any leads and that all new leads would go to new employee Kristen Gothers ("Gothers").

102. Instead, Roberts was to now call leads from 2019-2020, four years after a prospective student was interested in attending Cortiva, and still exceed his average enrollment of 20 students per month.

103. On May 10, 2023, Cortiva sent an email to Admissions Representatives, advising them that Compliance did not approve of the allocation of the table fee to tuition and that the representatives should individually address the students who question it.

104. On May 17, 2023, Lezcano, Hart, and Cook met with Roberts.

105. Instead of addressing Roberts' request regarding training or the illegal automated texts, Lezcano accused Roberts of failing to meet his May 2023 admissions goal.

106. All Admissions Representatives failed to meet Cortiva's unrealistic goal for May 2023.

107. Lezcano then mocked Roberts about him feeling "uncomfortable" with late-night automated text messages with his name on them.

108. Lezcano told Roberts that he was not changing Cortiva's text messaging parameters because Cortiva's consultants charged them thousands of dollars to advise them on this marketing strategy.

109. On May 18, 2023, Hart assigned all admissions staff to "shop" their competition by going to the school posing as a student and evaluating the school.

-11-

110. Roberts traveled nearly 65 miles while "shopping" competitors and was told that he would be reimbursed for his mileage.

111. On May 25, 2023, Cook asked Roberts to meet with her.

112. During that meeting, Cook told Roberts he had "an attitude" and he needed to significantly exceed his June and July enrollment goals.

113. Cook then ordered Roberts to meet with her on a weekly basis.

114. Unfortunately, Roberts had a death in the family and was away from work the two days following that meeting.

115. In early June 2023, Roberts called StudentAid.gov, which is an office of the United State Department of Education, to report Cortiva for pocketing money earmarked for student kits and misleading students.

116. Roberts was advised that he would have to submit his name to make a complaint and, in fear of losing his job, he did not follow up with a formal complaint.

117. In June 2023, Roberts noticed that all new leads that responded to text messages were being assigned to Gothers and that he had not been assigned any new leads since May 24, 2023.

118. One prospective student's response via text message indicated that there was a serious interest in Cortiva and that the Admissions Representative who handled the lead would likely be credited with the enrollment.

119. Roberts received old leads from aggregate lead source BSD and was assigned potential students who responded to text messages in Spanish.

120. Roberts does not speak Spanish and Cortiva's Cromwell campus does not offer instruction in Spanish.

-12-

121. On June 11, 2023, all of Roberts' outstanding leads were reassigned to Gothers.

122. Despite having his leads reassigned, Roberts was still expected to exceed his enrollment goals.

123. On June 14, 2023, a prospective lead assigned to Roberts replied to a text message and was immediately reassigned to Gothers.

124. During the end of June 2023, all incoming leads were transferred to Gothers.

125. On July 3, 2023, Roberts met with Cook and raised his concerns about leads being reassigned to Gothers.

126. Robert noted that over the weekend, 17 leads came in and 12 were assigned to Gothers, leaving him with only aggregate leads. Cook claimed this was a mistake and that she thought Roberts was going to be out of town that weekend.

127. Cook was incorrect; she, not Roberts, was out of town.

128. Cook then falsely claimed that she was assigning leads as Roberts requested, with 60% of leads going to Gothers and 40% of leads going to Roberts.

129. Roberts at no time requested that Gothers receive 60% of leads.

130. In late July 2023, Cook reassigned all esthetics leads to Gothers, leaving Roberts with only massage therapy leads, which was approximately 25% of the leads that came in.

131. Again, despite being set up to fail, Roberts was expected to exceed his monthly enrollment goals.

132. When Roberts asked why Gothers was receiving Esthetics leads, Cook told Roberts that it was better allocated that way because Roberts is a man and that esthetics students would feel more comfortable speaking with a woman.

-13-

133. Statistically, Roberts had a better lead-to-enrollment ratio for both programs and was one of the best performing Admissions Representatives at Cortiva.

134. In early August 2023, Corporate Chief Operating Officer Sheryl Lewis ("Lewis") visited Cortiva's Cromwell campus.

135. Roberts again raised concerns that he had been reporting the inflated kit fee all year and that students were still being charged for a massage table but not receiving one.

136. Roberts told Lewis that he believed this practice was not in compliance with the law and that he did not want to be complicit in illegal actions.

137. Roberts was disturbed by Cortiva's continued lack of transparency.

138. Within days of Roberts' report to Lewis, Cortiva began issuing refunds for part of the kit fee to students that enrolled for the September 1, 2023, session.

139. Cortiva still did not refund students who enrolled prior to August 1, 2023, and did not receive a massage table.

140. In August 2023, Hart was terminated, and Roberts began reporting to Cook.

141. While Roberts was out of the office on August 26, 2023, Cortiva sent a marketing text message to several thousand people that read, "Hello [name], my name is Justin R and I'd like to invite you to..." an open house held on Saturday, August 27, 2023.

142. The text messages sent by Cortiva did not have an option for the recipient to opt out of receiving marketing text messages nor did they advise recipients on procedures to stop the text messages.

143. Cortiva did not inform Roberts that it was sending this text out on his behalf.

144. Despite notifying Cortiva that he withdrew his consent to be used for marketing purposes, Robert's name was still being included in automated bulk text messages.

-14-

145. Roberts received so many text messages on August 27, 2023, he was unable to response to them all by the time the event started, making Mr. Roberts appear unprofessional.

146. Numerous responses also questioned Roberts about how he obtained their phone number or advised him to stop sending text messages.

**D.    Mr. Roberts Makes A Third Report of Good-Faith Concerns and Violations**

147. On August 26, 2023, Roberts again advised Cook by email that using his name and likeness in marketing and automated text messages was unacceptable.

148. Roberts again raised his objection to being included in the automated text messages in his August 28, 2023, weekly meeting with Cook.

149. During the meeting, Cook asked Roberts what he was going to do about the text messages.

150. Roberts admitted that there was not much that he could do, as he had asked them to stop and they did not, and Roberts noted that he was good at his job and leaving would put him in a difficult place financially.

151. Cook accused Roberts of planning to sue Cortiva to recoup his losses, which Roberts denied.

152. Roberts told Cook that he did not want to sue Cortiva, but if he was forced out of his job because his employer was "doing something that they weren't allowed to do," then he might be justified.

-15-

153. Roberts told Cook that he did not want to leave Cortiva, and he was coming to her to resolve the mass text issue.

154. On August 30, 2023, Roberts received an email notification about a text message from student Cemera Calloway ("Calloway").

155. In the message, Calloway stated, "Good morning Justin, I wanted to ask a question. A lot of students are telling me that you don't receive a massage table with your tuition but I was told that and it's on my paper of things that come with my tuition. They are saying they discontinued giving out massage tables?? Do I receive a massage table with my tuition?"

156. Roberts was unable to provide a satisfactory response.

157. On September 1, 2023, Roberts was recognized for outstanding performance, exceeding or nearly doubling monthly goals from May through August 2023.

158. Roberts' efforts helped Cortiva's Cromwell location become the largest campus in the company.

**E.      Roberts's Employment is Terminated After Raising Additional Good Faith Concerns.**

159. On September 26, 2023, Roberts again reported to Cook that automated text messages were being sent to prospective students at 3:00 am, days after the initial request for information was made.

160. Cook told Roberts she discovered the automated system had been sending text messages to thousands of people at a time and the messages would be sent 24 hours a day, continuously in queue.

-16-

161. Roberts told Cook text messages were being sent at 1:00 am, 2:50 am, and 3:00 am.

162. After that meeting, Cook began going into Roberts' office to observe him working.

163. On September 27, 2023, while observing Roberts working, Cook yelled at Roberts, and she told him that Hart had wanted to fire him after the April 17, 2023, meeting.

164. Cook stated Hart had come to Cook and Lezcano about terminating Roberts' employment because Roberts did not "fit in."

165. Cook told Roberts that Lezcano asked Hart if she really wanted someone on her team that would raise concerns such as Roberts had done.

166. On October 3, 2023, Cook told Roberts that she would begin splitting leads equally between Roberts and Gothers.

167. Roberts reported to Cook that at least four or five people had received text messages from the automated system at 4:14 am.

168. Cook told Roberts that she would investigate this issue.

169. Cook thereafter failed to give Roberts any Esthetics leads after this conversation and continued through the end of his employment.

170. On October 4, 2023, Roberts spoke with Financial Aid Representative John Lenois ("Lenois") about refunds for kit fees.

171. Roberts asked Lenois if students from February 1, 2023, to August 2023, were refunded as well as whether students were refunded after August 1, 2023.

172. Lenois told Roberts not all students were refunded.

173. On October 6, 2023, Cook terminated Roberts's employment at Cortiva.

-17-

174. Cook started the October 6, 2023, meeting by claiming Roberts was scheduled to work from 10:00 am to 2:00 pm but he arrived at work at 11:30 am, thirty minutes before a scheduled meeting with a prospective student.

175. Similar to other Admissions Representatives, Roberts was encouraged to have a flexible schedule that permitted him to accommodate the availability of potential students.

176. At no point prior to his termination was Roberts coached, warned, or disciplined for working a schedule that best suited the needs of prospective students.

177. Cook accused Roberts of being late every day.

178. Roberts advised Cook that he often worked well beyond his regular hours and rarely came in later when he did not have an early appointment.

179. Roberts noted that such an adjusted schedule had never been an issue for Cortiva prior to October 6, 2023, and that he had few morning appointments because of his lack of assigned leads.

180. Roberts told Cook that he had arrived early on Monday and Tuesday, in addition to staying late.

181. Cook shouted at Roberts, telling him not to call her a liar.

182. Roberts did not call Cook a liar.

183. Roberts reiterated that he worked full-time hours and had been starved for leads over the past several months.

184. Cook immediately took offense to Roberts' statement.

185. Cook continued berating Roberts and then told him to clock out for the day to go home.

-18-

186. As Roberts went to his office to clock out, Cook asked for his key.

187. Roberts asked Cook whether he was being sent home or terminated.

188. Cook replied that Roberts knew what she was doing, before confirming that Cortiva was terminating his employment.

## COUNT ONE

### RETALIATION,
### VIOLATION OF CONN. GEN. STAT. § 31-51q
### Against all Defendants

189. Plaintiff realleges and incorporates by reference the allegations made in Paragraphs 1-188, with the same force and impact as if fully set forth herein.

190. Connecticut General Statute section 31-51q protects the rights of an employee that relate to "the exercise by [an] employee of rights guaranteed by the first amendment to the United States Constitution or section ... 4 ... of article first of the Constitution of the state [of Connecticut]."

191. Connecticut General Statute section 31-51q protects employees from retaliatory discharge when they invoke constitutionally guaranteed free speech rights that protect statements that address a matter of public concern.

192. "An employee's speech addresses a matter of public concern when the speech can be fairly considered as relating to any matter of political, social, or other concern to the community ..." *Schumann v. Dianon Systems, Inc.,* 304 Conn. 585, 602 (2012).

193. "[S]peech deals with matters of public concern ... when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public . . ." *Gleason v. Smolinski,* 319 Conn. 394, 412 (2015).

194. In 1991, Congress passed the Telephone Consumer Protection Act ("TCPA") to protect consumers from businesses that use automatic telephone dialing systems to deliver prerecorded messages without prior consent. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 370-71 (2012) (noting that the TCPA was enacted in response to "[v]oluminous consumer complaints about abuses of telephone technology.")

195. The TCPA has been regularly amended to include promotional text messages and ban various privacy-invading practices, including calling or texting before 8:00 am or after 9:00 pm local time.

196. The TCPA provides for either actual damages or statutory damages ranging from $500 to $1,500 per unsolicited message. 47 U.S.C. § 227(b)(3).

197. Educational institutions that participate in Title IV of the Higher Education Act ("Title IV") programs in order for students to receive federal funding for their education are required to comply with numerous regulations. *See* 88 F.R. 74696.

198. By entering into participation, the institution agrees to comply with all statutory provisions of or applicable to Title IV. *See* 34 C.F.R 668.14.

199. 34 C.F.R 668.43 requires that institutions must make certain information readily available to enrolled and prospective students, such as the cost of attending the institution, including tuition and fees charged to full-time and part-time students, estimates of costs for necessary books and supplies, and any additional cost of a program in which a student is enrolled or expresses a specific interest.

200. 34 C.F.R. 668.73 prohibits misrepresentation concerning the nature of an institution's financial charges, including, but not limited to, whether a particular charge is the customary charge at the institution for a course.

-20-

201. Plaintiff raised matters of public concern when he reported to Defendants the company was in violation of TCPA by sending promotional text messages to prospective students outside of permitted hours between 8:00 am and 9:00 pm local time.

202. Plaintiff raised matters of public concern when he reported to Defendants that the company was in violation of Title IV by withholding information from students and prospective students about what was included in the mandatory kit fee of $795 to prevent students and prospective students from challenging the amount of the fee.

203. Plaintiff raised matters of public concern when he called StudentAid.gov, which is an office of the United States Department of Education, to report Defendants for pocketing money earmarked for student kits in violation of Title IV of the Higher Education Act, 34 C.F.R 668.43, and 34 C.F.R 668.73.

204. Plaintiff was exercising his free speech on matters of public concern with respect to Defendants' violations of law (Title IV of the Higher Education Act and the Telephone Consumer Protection Act), which is protected by Sections, 3, 4, and 14 of the Connecticut Constitution and Conn. Gen. Stat. § 31-51q.

205. The exercise of these rights did not interfere with Plaintiff's job performance or working relationship.

206. The exercise of these rights was not within the scope of Plaintiff's job duties and was solely done to raise matters of public concern regarding violations of law.

207. Plaintiff was subjected to retaliation for voicing concerns over these issues by Defendants harassing him, depriving Plaintiff of leads, threatening termination, and ultimately terminating his employment.

-21-

208. These acts of retaliation were the direct result of Plaintiff's speech on issues of public concern regarding Defendants' violations of law.

209. As a result of the foregoing conduct, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety and loss of the ability to enjoy life's pleasures and activities.

210. Plaintiff seeks compensatory and punitive damages for Defendants' misconduct.

## COUNT TWO

### RETALIATION,
### VIOLATION OF CONN. GEN. STAT. § 31-51m
### Against all Defendants

211. Plaintiff realleges and incorporates by reference the allegations made in Paragraphs 1-210, with the same force and impact as if fully set forth herein.

212. Connecticut General Statute § 31-51m protects employees who report an employer's illegal activities or unethical practices to a public body from discharge, discipline, or other penalties.

213. In early June 2023, Plaintiff called StudentAid.gov, which is an office of the United States Department of Education, to report Defendants for pocketing money earmarked for student kits in violation of Title IV of the Higher Education Act, 34 C.F.R 668.43, and 34 C.F.R 668.73.

214. The United States Department of Education is a "public body" as defined under Connecticut General Statute § 31-51m(4)(B).

215. The United States Department of Education is the public body that regulates the

-22-

violations for which Plaintiff anonymously complained regarding Defendants' unlawful conduct under Title IV of the Higher Education Act, 34 C.F.R 668.43, and 34 C.F.R 668.73.

216. Defendants retaliated against Plaintiff for reporting these illegal activities by harassing him, depriving Plaintiff of leads, threatening termination, and ultimately terminating his employment.

217. There is a causal connection between Defendants' termination of Plaintiff's employment and Plaintiff's report of Defendants' illegal conduct to a public body.

218. As a result of the foregoing conduct, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety and loss of the ability to enjoy life's pleasures and activities.

219. Plaintiff seeks compensatory and punitive damages for Defendants' misconduct.

## COUNT THREE

### WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY
### Against all Defendants

220. Plaintiff realleges and incorporates by reference the allegations made in Paragraphs 1-219, with the same force and impact as if fully set forth herein.

221. Connecticut recognizes a common law cause of action for wrongful discharge based on a violation of public policy.

222. Defendants terminated Plaintiff's employment in connection with him complaining about Defendants' violations of law (Title IV of the Higher Education Act and the

-23-

Telephone Consumer Protection Act).

223. Plaintiff's discharge, as set forth above, violated important public policies in the State of Connecticut, including, but not limited to, policies with respect to an employee's rights and a whistleblower's rights.

224. Plaintiff is otherwise without remedy and permitting his discharge to go unredressed would leave a valuable social policy to go unvindicated.

225. As a result of his wrongful discharge, Roberts has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety, and loss of the ability to enjoy life's pleasures and activities.

226. Roberts seeks compensatory and punitive damages for Defendants' misconduct.

## **PRAYER FOR RELIEF**

Wherefore Plaintiff prays that this Court award all damages allowed by law and order:

1. Reinstatement to one of the positions to which he is entitled by the virtue of his application and qualifications, and expunge his personnel file of all negative documentation;

2. Monetary damages;

3. Punitive damages;

4. Reasonable attorney fees, and costs;

5. Pre-judgment interest

6. Trial by jury; and

-24-

7. Such other relief as the Court deems just, fair, and equitable.

THE PLAINTIFF,
JUSTIN ROBERTS

By: _____/s/_____

Michael C. McMinn (#423555)
**THE MCMINN EMPLOYMENT**
**LAW FIRM, LLC**
1000 Lafayette Blvd., Suite 1100
Bridgeport, CT 06604
Tel: (203) 683-6007
Fax: (203) 680-9881
michael@mcminnemploymentlaw.com

COUNSEL FOR PLAINTIFF

A TRUE COPY
ATTEST:

-25-

RETURN DATE:

JUSTIN ROBERTS                           :        SUPERIOR COURT
                                         :
            Plaintiff,                   :        J.D. OF MIDDLESEX
                                         :        AT MIDDLETOWN
v.                                       :
                                         :
OUTSIDE THE BOX EDUCATION LLC,           :
d/b/a CORTIVA INSTITUTE,                 :
                                         :
            Defendants.                  :        APRIL 3, 2024

## STATEMENT OF AMOUNT IN DEMAND

The amount in demand is not less than fifteen thousand dollars ($15,000) exclusive of interest and costs.

                                    THE PLAINTIFF,
                                    JUSTIN ROBERTS

                              By: _____ /s/ _____
                                    Michael C. McMinn (#423555)
                                    **THE MCMINN EMPLOYMENT
                                    LAW FIRM, LLC**
                                    1000 Lafayette Blvd., Suite 1100
                                    Bridgeport, CT 06604
                                    Tel: (203) 683-6007
                                    Fax: (203) 680-9881
                                    michael@mcminnemploymentlaw.com

                                    COUNSEL FOR PLAINTIFF

A TRUE COPY
ATTEST:

CHARLES J. LILLEY
STATE MARSHAL INDIFFERENT PERSON

-26-

OUTSIDE THE BOX EDUCATION LLC    1308123

Business status
ACTIVE

Date formed
5/1/2019

Citizenship/place of formation
Foreign/FL

Business type
LLC

Business address
45 SHUNPIKE ROAD SUITE 10, CROMWELL,
CT, 06416, United States

Mailing address
420 SOUTH STATE ROAD 7, HOLLYWOOD, FL,
33023, United States

Office in jurisdiction
420 SOUTH STATE ROAD 7, HOLLYWOOD, FL,
33023, United States

Mailing address state of formation
420 SOUTH STATE ROAD 7, HOLLYWOOD, FL,
33023, United States

Annual report due
3/31/2025

Last report filed
2024

NAICS code
Other Technical and Trade Schools (611519)

NAICS sub code
611519

## Principal Details

## Agent details

Agent name
Secretary of State

Agent Business address
165 Capitol Ave., P.O. BOX 150470, Hartford,
CT, 06115-0470, United States

Agent Mailing address
30 TRINITY STREET, HARTFORD, CT, 06106,
United States